ACCEPTED
03-15-00586-CR
7353653
THIRD COURT OF APPEALS
AUSTIN, TEXAS
10/13/2015 2:39:06 PM
JEFFREY D. KYLE
CLERK

**No. 03-15-00586-CR**

In the
**COURT OF APPEALS**
For the
**THIRD SUPREME JUDICIAL DISTRICT**
at Austin

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
10/13/2015 2:39:06 PM
JEFFREY D. KYLE
Clerk

_____

On Appeal from the 368th Judicial District Court of
Williamson County, Texas
Cause Number 13-0826-K277

_____

**CRISPIN JAMES HARMEL, Appellant**
*v.*
**THE STATE OF TEXAS, Appellee**

_____

**APPELLANT'S BRIEF**

_____

*Counsel for Appellant*
*Crispin James Harmel*

**KRISTEN JERNIGAN**
ATTORNEY AT LAW
STATE BAR NUMBER 90001898
207 S. AUSTIN AVE.
GEORGETOWN, TEXAS 78626
(512) 904-0123
(512) 931-3650 (FAX)
Kristen@txcrimapp.com

**ORAL ARGUMENT REQUESTED**

# IDENTIFICATION OF PARTIES

Pursuant to Texas Rule of Appellate Procedure 38.1, a complete list of the names of all interested parties is provided below so the members of this Honorable Court may at once determine whether they are disqualified to serve or should recuse themselves from participating in the decision of this case.

**Appellant:**

Crispin James Harmel

**Counsel for Appellant**:

Ryan Deck (at trial)                          Scott Magee (at trial)
107 N. Lampasas                               107 N. Lampasas
Round Rock, Texas 78664                       Round Rock, Texas 78664

Kristen Jernigan (on appeal)
207 S. Austin Ave.
Georgetown, Texas 78626

**Counsel for Appellee, The State of Texas:**

Jana Duty
Williamson County District Attorney
Mark Brunner
Brent Webster
Assistant District Attorneys
405 Martin Luther King
Georgetown, Texas 78626

**Trial Court Judge:**

The Honorable Rick J. Kennon

# TABLE OF CONTENTS

IDENTIFICATION OF PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

INDEX OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .iv

STATEMENT REGARDING ORAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . .vi

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

ISSUES PRESENTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

ARGUMENT & AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

> *The trial court abused its discretion in denying Appellant's Pre-trial Application for Habeas Corpus Relief because the prosecutor's conduct in provoking a request for mistrial in this case was intentional.*

PRAYER FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .26

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .26

CERTIFICATE OF WORD COUNT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .27

# INDEX OF AUTHORITIES

## CASES

*Abney v. United States*, 431 U.S. 651 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Ex parte Lewis*, 219 S.W.3d 335 (Tex. Crim. App. 2007) . . . . . . . . . . . . .21, 23, 25

*Ex parte Masonheimer,* 220 S.W.3d 494 (Tex. Crim. App. 2007) . . . . . . .23, 24, 25

*Ex parte Pierson*, 426 S.W.3d 763 (Tex. Crim. App. 2014) . . . . . . . . . . . . . . . . 21

*Ex parte Peterson*, 117 S.W.3d 804 (Tex. Crim. App. 2003) . . . . . . . . . . . . . .21, 23

*Ex parte Watkins*, 73 S.W.3d 264 (Tex. Crim. App. 2002) . . . . . . . . . . . . . . . . 19

*Gonzalez v. State*, 8 S.W.3d 640 (Tex. Crim. App. 2000) . . . . . . . . . . . . . . . . . 20

*Headrick v. State*, 988 S.W.2d 226 (Tex. Crim. App. 1999) . . . . . . . . . . . . . . . 19

*Oregon v. Kennedy*, 456 U.S. 667 (1982) . . . . . . . . . . . . . . . . . . . . .21, 23, 24, 25

*Sandifer v. State*, 233 S.W.3d 1
(Tex. App.—Houston [1st Dist.] 2007) . . . . . .20, 21, 22, 24, 25

## STATUTES AND RULES

TEX. R. APP. P. 38.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .ii

TEX. R. APP. P. 39.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

## **STATEMENT REGARDING ORAL ARGUMENT**

Pursuant to Texas Rule of Appellate Procedure 39.1, Appellant requests oral argument in this case.

No. 03-15-00586-CR

In the
**COURT OF APPEALS**
For the
**THIRD SUPREME JUDICIAL DISTRICT**
at Austin

_____

On Appeal from the 368th Judicial District Court of
Williamson County, Texas
Cause Number 13-0826-K277

_____

**CRISPIN JAMES HARMEL, Appellant**
*v.*
**THE STATE OF TEXAS, Appellee**

_____

**APPELLANT'S BRIEF**

_____

**STATEMENT OF THE CASE**

On May 9, 2013, Appellant was indicted for the offenses of capital murder, aggravated kidnaping, and aggravated robbery. (CR: 9-10). The State proceeded to trial on that indictment and on April 28, 2014, trial began. (CR: 359-71). On May 7, 2014, the trial court granted a mistrial after it was discovered Appellant and his counsel were not provided with the means to view timestamps on a Walmart surveillance videotape. (CR: 382). On March 4, 2015, Appellant was re-indicted for capital murder. (CR: 426). On March 18, 2015, Appellant

1

filed a Pre-Trial Motion for Writ of Habeas Corpus and Request for Hearing. (CR: 436-516). In his motion, Appellant argued that his protection against Double Jeopardy would be violated if he were to be re-tried because the State's conduct in provoking the request for mistrial during the original trial was intentional. (CR: 436-516). A hearing was held, after which, the trial court entered findings of fact and conclusions of law denying Appellant's pre-trial claim for habeas corpus relief. (CR: 890). The Court's findings of fact and conclusions of law were signed on September 10, 2015. (CR: 890). Appellant timely filed Notice of Appeal the next day, September 11, 2015. (CR: 891). This appeal results.

## STATEMENT OF FACTS

### Original Trial

In the original trial, the defense was predicated primarily on a surveillance video obtained from a Walmart security camera. (CR: 456, 499-500). The video that was provided to the defense, when played on the player provided by the State, did not show timestamps and based on trial counsels' review of the video, there were thirteen hours of surveillance. (CR: 438). Based on that assumption, trial counsel argued that Applicant could not have been with the victim at the time the alleged offense in this case occurred. (CR: 438). Prior to trial, on April 13,

2

2014, counsel made a request in writing for a time-stamped copy of the video based on indications in the offense report that a time-stamped copy existed. (CR: 503). The District Attorney, Jana Duty, replied on that same date that the video that she had and that she gave a copy to trial counsel, "is not time stamped." (CR: 505). She continued, "I would like a time stamped copy myself, but that is not what I was given." (CR: 507). On April 14, 2014, Ms. Duty sent a follow-up email indicating that Detective Pando of the Cedar Park Police Department "brought over another copy of the Wal-Mart videos and none of them are time stamped." (CR: 507).

At trial, defense counsel focused their opening statement and cross-examination of the State's witnesses based on the copy of the video they received that did not contain timestamps. (CR: 456, 502). Detective Larry Bond, the sponsoring witness of the video was called to testify and during his testimony the State produced a video that contained timestamps. (CR: 456). Defense Counsel objected and pointed out the unfairness of attacking Appellant's defense with evidence it requested, but was not provided. (CR: 503-04). The State represented to the Court that representatives of the State had learned to play the video with new software on Friday, May 3, 2013, but despite this fact, they never informed trial counsel of their discovery and played the video with

3

timestamps on Monday, May 7, 2013 before the jury. (CR: 454-56, 490-91). When confronted with the fact that the State never produced a time-stamped copy of the video, First Assistant District Attorney Mark Brunner stated that he referenced the March player (the proprietary software used to view timestamps on the Walmart surveillance video) during Bond's direct testimony and that "It's only after I did some damage to their lovely cross that we're upset." (CR: 479). The Court stated "I'm not going to fault the Defense for the delay of trying to figure out where we are right now. I'm not going to fault them for that." (CR: 479).

As for Duty, she stated on the record, "For the past year, I've been working on the same system that he has. I've also been very frustrated by not having this. I have sent e-mails to Detective Pando, hey, there's a reference to time-stamps. He's like, when it downloads onto the disc, that we give you, that's how it downloads. Sorry. That's the way you've got it. We weren't purposefully hiding anything." (CR: 500-01). However, in a telling exchange, after the Court indicated its concern that the defense did not have the ability to prepare a defense, Brunner stated, "Your Honor, had they come to us pre-trial and said, Hey, we can't open this up. You're talking about time-stamps here, and there is this player, it's not working. We go on the March System, we can't get online because we're not law enforcement. We could have had this hearing two, three months ago. And I

4

would have said, 'I'll bend whatever copyright rules I need to bend for you, gentlemen, I'll get you that player.'" (CR: 477). The trial court had to point out to Brunner that according to Brunner's version of events, "But you didn't know then." (CR: 477).

When discussing the prejudice to Appellant, Defense Counsel stated that he was ill-prepared based on the State's presentation of a previously requested, but not produced piece of evidence, that deprived Appellant of a fair trial. (CR: 486). Counsel continued that the State's re-direct of Detective Bond unfairly made the defense "look bad." (CR: 486). To which Brunner replied, "Your Honor, it's part of my job to make them look [bad]. That's what trial is for." (CR: 486).

Because of the surprise and obvious prejudice to the defense, trial counsel requested a mistrial, which the court granted. (CR: 454-62, 473). At the time, the mistrial was granted without prejudice because, despite the State's failure to inform Appellant of the existence of software to view timestamps on the Walmart video, there did not, at the time, appear to be any other misconduct on the part of the State. (CR: 473-74).

**Hearing on Appellant's Double Jeopardy Writ**

During the hearing on Application's Pre-Trial Petition for Writ of Habeas Corpus Relief, Duty agreed that prior to trial, lead defense counsel, Ryan Deck,

sent an email request for a "time-stamped version of the video [Walmart surveillance video]." (RR7: 100). Duty acknowledged that Detective Dailey's offense report in this case used the word "time-stamp" but stated that she never asked Detective Dailey about time-stamps. (RR7: 101-02). Duty stated that instead of speaking to Detective Dailey, who specifically referenced timestamps in his report, she asked Detective Pando about obtaining a time-stamped copy of the video. (RR7: 102). However, Duty then admitted that she told Deck (lead counsel) that she did, in fact, intend to speak to Detective Dailey. (RR7: 115). Duty admitted further that in his request for a time-stamped copy of the video, Deck even referenced Detective Dailey's report from September 9, 2009, that refers to "timestamps." (RR7: 116). Duty admitted that at some point prior to trial, it was decided that Detective Bond was going to be called to testify at trial about a timeline of events for the night of the alleged offense in this case. (RR7: 105-06). Duty testified that she did not ask Detective Bond about timestamps because she did not know "what that meant." (RR7: 106). Duty stated that she was watching a different player and did not know what a timestamp was. (RR7: 114-15). Duty testified that it was the practice of her office for discovery requests to go through the prosecutor and not through the detectives assigned to the case. (RR7: 117-19). Duty stated that during trial, she directed her trial team, including

6

Mark Brunner, Paul Davis, and Detective Bond to figure out the "time issue." (RR7: 122-23). Duty agreed that the timeline was a "huge part of the defense." (RR7: 123). She testified later on cross-examination that the Walmart surveillance video was "key to this case." (RR7: 179). Duty testified that when Defense Counsel asked her for the information regarding timestamps, she did not bother to figure it out, but during trial, she decided it was important. (RR7: 124-25). Duty testified that it took "all weekend" for her trial team to "figure out" how to play the timestamps. (RR7: 126). Duty was confronted with the testimony of her employees, Mark Brunner and Paul Davis, who both stated that they "figured it out" on either Thursday or Friday of the first week of trial. (RR7: 128-29). While agreeing Brunner and Davis were telling the truth, and that she attached Davis's affidavit to a pleading, Ms. Duty stated again that she remembered it being Monday that the timestamp issue was resolved. (RR7: 129). When asked if she spoke to Brunner or Davis over the weekend, Duty then changed her answer and said it might have been Sunday "that they said, We figured this out." (RR7: 130). Duty stated that even though the timestamp issue was a "Code Red" over the weekend, she did not speak to her trial team until Sunday night. (RR7: 130-31). Duty testified that she learned the timestamp "dilemma" was solved by playing the Walmart surveillance video on a different

player, not by playing different videos. (RR7: 131). Duty testified that she remembered Defense Counsel had asked about the timestamps but did not tell him about how to play the video with timestamps once the State resolved the issue. (RR7: 131-32). Duty explained her failure to tell the defense about the software player to show the timestamps by stating that if the State could figure it out, the defense should have, "And after the way [she] was treated throughout that entire trial, [she] really didn't feel very magnanimous." (RR7: 132). Duty agreed that the State had a "very big advantage" in knowing how to play the Walmart surveillance video and that she knew the defense did not know how to play the video with timestamps. (RR7: 137). Duty stated that she had a discussion with her trial team and that they "all had the same opinion" that it was not the State's job to teach the defense how to play the video with timestamps. (RR7: 137). Duty continued that she did not tell the defense how to play the video with timestamps because the State "earned it." (RR7: 138). Duty then admitted that she willfully withheld the fact that the timestamps were embedded on the disc but had to be played with a specific player. (RR7: 139-40). Duty agreed that her former investigator, Royger Harris, filed a sworn affidavit stating that he and Duty watched the time-stamped video together. (RR7: 140). Duty testified that she initially refuted Harris's statement saying it was "not possible" until it was

8

revealed through a forensic investigation of her computer that the program to watch the video with timestamps was on her computer. (RR7: 140-42). Duty then admitted that prior to trial she watched the video with timestamps on her computer. (RR7: 142, 147, 149). Duty admitted further that inconsistent statements can be an indication of guilt. (RR7: 144). Duty agreed that if the State had turned over evidence, but information included within that evidence was encrypted or hidden, the State should provide the defense with the means to view that information. (RR7: 168-69). Duty agreed further that she had a duty to tell the defense how to view the timestamps on the video once she learned how to view them. (RR7: 170). Duty reiterated her stance that prior to trial, she did not know what a "timestamp" was even though she was asked about timestamps by the defense and had actually watched the video with timestamps prior to trial. (RR7: 172). Duty stated that this case has become personal and that defense counsel was not wrong for investigating the double jeopardy issue since the defense now knows that Duty watched the video with timestamps prior to trial and the software to watch the video with timestamps was on her computer all along. (RR7: 174). Duty stated that she never would have sent her computer to be analyzed if she knew the software was on her computer. (RR7: 174). On cross-examination by Brunner, Duty stated that she learned that in order to watch the timestamps on the

9

Walmart video surveillance, one either had to use a seven year-old laptop computer or a software player that was proprietary to law enforcement. (RR7: 192-93). Duty agreed that defense counsel came to the State and requested timestamps but the State "gave them some bad information." (RR7: 194). Duty acknowledged that her conduct resulted in the mistrial in the original trial in this case and that the trial judge was disappointed in the State's choice not to inform the defense once the State figured out how to play the timestamps. (RR7: 195). Duty admitted that Defense Counsel asked her many times for a copy of the video with timestamps. (RR7: 198). Duty stated that the Defense came to the State for a solution in watching the video with timestamps but the State could not help. (RR7: 199). Duty characterized the situation as "Blind leading the blind." (RR7: 199). Duty agreed that over the weekend in the first trial, the State learned how to play the timestamps for the jury "and show it to them in a smooth manner, not just allude to it, but display it for them." (RR7: 201). Duty stated that she did not feel obligated to tell the Defense how to view the timestamps on the video because "if we can figure it out, they can figure it out," because the Defense had a computer expert,[1] and because "[defense counsel] acted so horribly to me during

[1] The Defense's computer expert was appointed to review computer data, not analyze surveillance video, which is a completely separate science. Further, because at the time of trial, the State had affirmatively stated there was not a time-stamped copy of the video, there would be no reason for an expert to review the video. (CR: 879); (RR8: 97, 104-05).

10

the first trial, that I just – I didn't even want to speak to them." (RR7: 201). Duty agreed that when the timestamps were shown to the jury, the Defense "basically had no more case left." (RR7: 209). Duty testified that had she discovered how to play the timestamps on the video prior to trial, she would have disclosed that information to Deck because they were on a "friendly… working basis" at that time. (RR7: 212-13). Duty testified that she is now "paying the price for not being nice" and that she did not share the information regarding how to play the timestamps on the video during the weekend of the first trial. (RR7: 215). Duty tried to explain away her conduct by stating that when the mistrial was declared, it was requested by the defense and the defense, at that time, did not allege any prosecutorial misconduct. (RR7: 216). On re-direct examination, Duty agreed that at the time of the mistrial, the Defense was not aware that Duty had actually watched the video with timestamps on her computer with the correct player prior to trial. (RR7: 220).

Detective Ricky Pando testified that he was the lead detective in this case and testified at the previous trial. (RR7: 232). Detective Pando stated that prior to trial, Duty contacted him and asked for "time-stamps" on the video. (RR7: 233). Detective Pando agreed that Detective Dailey's report dated September 9, 2009, referenced "time-stamp," but Detective Pando never asked Detective Dailey

11

about a time-stamped copy of the video. (RR7: 235). Detective Pando also agreed that Detective Dailey's report from September 10, 2009, listed specific times and that Detective Dailey got those times "from the video." (RR7: 236). Detective Pando testified that when he watched the Walmart surveillance video prior to trial, he was able to see timestamps. (RR7: 237). Despite this fact, when asked if he shared that information with Duty, all Detective Pando said to her was "you've got what I've got," but he did not remember if he told her verbally, by email, or in a text message. (RR7: 237-38, 241-42). Detective Pando admitted that Duty asked him for a time-stamped video and he took her the videos that he had. (RR7: 240). Duty never contacted him again to explain that she still could not see the timestamps on the video. (RR7: 241, 246-47). Detective Pando testified that Detective Dailey also had the ability to view the timestamps on the video prior to trial. (RR7: 242). Detective Pando showed Detective Bond how to watch the timestamps on the video prior to trial. (RR7: 243). Detective Pando then stated several times that he did not know for sure what Duty meant by a "timestamp." (RR7: 247-49). When pressed repeatedly, Detective Pando was forced to admit that as a lead detective, he actually did know what a timestamp was and that he knew what Duty was talking about. (RR7: 249). Detective Pando stated that when Duty contacted him she stated that the Defense was having trouble

12

viewing the timestamps, not that Duty was having trouble. (RR7: 257). Detective Pando stated that he watched the Walmart surveillance video with timestamps more than twenty times prior to trial and prior to Duty telling him the Defense was having trouble viewing the video with timestamps. (RR7: 262). Detective Pando testified that prior to trial, Detective Bond was having trouble viewing the video, so he "reached underneath [his] desk" and pulled out a laptop and said "[h]ere, you shouldn't have any trouble viewing it with this." (RR7: 268). Detective Pando agreed he could have helped someone if they had come to him and said they were having trouble watching the video with timestamps. (RR7: 270).

Detective Larry Bond testified that he had a conversation with Detective Pando prior to trial in which Detective Pando related that the Defense in this case was asking for another copy of the video because the one they had was not working. (RR7: 272). Detective Bond testified that Duty never asked him about timestamps. (RR2: 273-74). Detective Bond stated that he was able to view timestamps on the Walmart surveillance video in 2009. (RR2: 274-75). Prior to trial, Detective Bond had trouble viewing the video, so he asked Detective Pando for help. (RR7: 279). Detective Pando indicated he could watch the video on his computer and did not say "You got what I got." (RR7: 280). Ultimately,

13

Detective Pando gave Detective Bond a laptop and Detective Bond was able to play the video with timestamps. (RR7: 281). Detective Bond stated that on the Friday of the first trial, he had a conversation with Brunner about timestamps being embedded in the discs. (RR7: 278). Over the weekend, Detective Bond, Brunner, and Davis discussed how to play the video with timestamps in front of the jury, but at the least, were able to see the timestamps on the video on Friday. (RR7: 295-98). The following Monday, during trial, Detective Bond "Google'd" the March Video System and found a player that would play all previous players. (RR7: 297). Detective Bond testified that prior to trial when he played the video on Windows Media Player, he knew immediately it was not the same video he had watched with timestamps. (RR7: 304).

Detective Christopher Dailey testified that he originally watched the Walmart surveillance video with timestamps in 2009. (RR8: 8-9). Detective Dailey did not watch the video again prior to trial and never watched the video with anyone from the District Attorney's Office. (RR8: 10-11). Detective Dailey knew all along that the timestamps were embedded in the discs that contained the video. (RR8: 11). Every time Detective Dailey watched the video, he did so on a laptop at the Cedar Park Police Department. (RR8: 13). Detective Dailey testified that it was well-known at the Police Department that in

14

order to play Walmart surveillance video properly, one had to use the laptop. (RR8: 13). Detective Dailey testified that he never met with the prosecutors in this case to prepare for trial. (RR8: 15).

Detective Pando was re-called and admitted that if Duty told him she was having trouble watching the video with timestamps, rather than the Defense, he would have shown her how to watch the video with timestamps with the laptop from the Cedar Park Police Department. (RR8: 20-21). When Detective Pando was confronted with the fact that he and Duty both initially testified that they did not know what a timestamp was, and was asked if they colluded to testify similarly, Detective Pando answered that he did not "understand what 'collusion' means." (RR8: 22). Detective Pando was asked who he talked to "about [his] testimony or testifying in general." Detective Pando replied, "Mr. Brunner." (RR8: 23). When asked if he spoke to anyone else, and specifically if "anyone helped [him] with testimony or [his] testifying," Detective Pando replied, "No." (RR8: 23-24). The Defense passed Detective Pando. (RR2: 24). The trial court then intervened and informed the Defense that the Courtroom had been used by Detective Pando and someone "to get him to be a better public speaker." (RR8: 24). Finally, after many more questions, Detective Pando admitted that a public speaking coach helped him prepare for the retrial in this case and

15

specifically, "discussed about what [his] answers were." (RR8: 27). Detective Pando stated that Vicki Vickers, the Office Manager for the District Attorney's Office, recommended the public speaking coach. (RR8: 29).

Sergeant John Rowe of the Round Rock Police Department testified that as a certified computer forensics examiner, he was asked by Royger Harris, then an investigator with the Williamson County District Attorney's Office, to analyze a portion of the Walmart surveillance video in the present case. (RR8: 38). When Harris brought Sergeant Rowe the video, he also brought a list of timestamps and asked Sergeant Rowe to enhance a portion of the video based on those timestamps. (RR8: 39-40). When Sergeant Rowe reviewed the video, it showed timestamps. (RR8: 40-41). Sergeant Rowe advised that it takes a specific player and specific software to watch the video with timestamps and that the software is proprietary. (RR8: 41).

Detective Feliciano Acevedo of the Round Rock Police Department testified that he analyzed Duty's computer and found the March Systems Player, which is used to watch timestamps on Walmart surveillance videos, on her computer. (RR8: 64). Detective Acevedo testified that his analysis also showed that the player was opened three times in 2013. (RR8: 67). Further, the desktop shortcuts to the player had since been deleted. (RR8: 68). Detective Acevedo

16

explained that those who are not particularly "tech savvy," would think the entire program would be deleted off the computer if the shortcut were deleted, but that that is not, in fact, the case.   (RR8: 68-69).

Duty was re-called and testified that on April 13, 2014, she received an email from lead defense counsel, Mr. Deck that read, "I'm wondering if there's a time-stamped version of the videos.   If there is, I'd like a time-stamped version of the videos."   (RR8: 96-97).   Duty testified that she replied, "I'd like a time-stamped copy myself" and would contact Detective Dailey.   (RR8: 97). Duty then replied later that "Detective Pando brought over another copy of the Walmart videos and none of them are time-stamped."   (RR8: 104-05).   Duty was confronted with her prior testimony that she did not know what a timestamp was prior to trial and agreed that by asking for a "time-stamped copy," and stating that "none of them are time-stamped," it could be inferred that she knew what a timestamp was.   (RR8: 104-05).   Duty was also confronted with an email from April 16, 2014, in which she told Deck that there was video footage from an establishment called "Fast Eddie's" and that "All the footage is time-stamped. The time-stamps show that they got to Fast Eddie's just before 10:00 p.m." (RR8: 123).   Duty agreed that this also reflects someone who knows what a timestamp is.   (RR8: 123).   Duty agreed that she never told Detective Pando that

17

she needed time-stamps and only told him the Defense wanted them. (RR8: 107). Duty was asked, based on Detective Bond's testimony, that if, at one point in time, the only way to watch the video with timestamps was on an old laptop belonging to the Cedar Park Police Department, which was in the sole possession of the State, the State had an ethical obligation to inform the defense of that fact. (RR8: 109). Duty responded, "I was not part of that. I was not part of that." (RR8: 109). Duty was then asked if Brunner knew how to view the timestamps on the video and the only way to view them was through a computer in the sole possession of the State, did Brunner have an obligation to inform the defense of that fact. (RR8: 110). Duty responded, "If that was the only way to view that information, then, yes, we would have needed to tell you that." (RR8: 110-11). Duty agreed that if she were in Brunner's shoes and knew on Thursday or Friday of the first trial that the only way to view the timestamps on the video was with Cedar Park's laptop, she would have told the defense. (RR8: 111).

## **ISSUE PRESENTED**

Whether the trial court abused its discretion in denying Appellant's Pre-trial Application for Habeas Corpus Relief where the prosecutor's conduct in willfully withholding evidence and provoking a request for mistrial was undisputedly intentional.

18

Appellant's point of error should be sustained because the record is clear that the State's conduct in provoking the request for mistrial in the original trial of this case was intentional. Therefore, the trial court abused its discretion in denying Appellant's request for pre-trial habeas corpus relief based on double jeopardy grounds. *Ex parte Lewis*, 219 S.W.3d 335, 371 (Tex. Crim. App. 2007).

## ARGUMENT & AUTHORITIES

### I. Pre-trial Appeal of Claim of Double Jeopardy

As a preliminary matter, it is well-settled that an accused may apply for a pre-trial writ of habeas corpus on double jeopardy grounds and appeal the denial of habeas corpus relief pre-trial. *Ex parte Watkins*, 73 S.W.3d 264, 273-74 (Tex. Crim. App. 2002); *Headrick v. State*, 988 S.W.2d 226, 228 (Tex. Crim. App. 1999). In *Abney v. United States*, the United States Supreme Court observed that the preferred procedural vehicle for review of a double jeopardy claim was a pretrial writ of habeas corpus because:

> The rights conferred on a criminal accused by the Double Jeopardy Clause would be significantly undermined if appellate review of double jeopardy claims were postponed until after conviction and sentence. To be sure, the Double Jeopardy Clause protects against being twice convicted for the same crime, and that aspect of the right can be fully vindicated on appeal following final judgment, as the Government suggests. However, the Court has long recognized that the Double Jeopardy Clause protects an individual against more than

being subjected to double punishments. It is a guarantee against being twice put to trial for the same offense.

*Abney v. United States*, 431 U.S. 651, 660-61 (1977). A double jeopardy complaint, preserved at the trial court level, as is the case here, is properly preserved for appeal. *See Gonzalez v. State*, 8 S.W.3d 640, 644 (Tex. Crim. App. 2000). A trial court's ruling on a pre-trial application for habeas corpus relief based on double jeopardy grounds is reviewed under an abuse of discretion standard. *Sandifer v. State*, 233 S.W.3d 1, 3 (Tex. App.—Houston [1st Dist.] 2007).

**II.    Re-trial is barred where the State's conduct in provoking a request for a mistrial is intentional.**

It is well-settled that the Fifth Amendment's Double Jeopardy Clause protects a criminal defendant from repeated prosecutions for the same offense. *Oregon v. Kennedy*, 456 U.S. 667, 671 (1982). In *Oregon v. Kennedy*, the Supreme Court held that intentional conduct on the part of the State that provokes a defense motion for mistrial bars retrial. *Id*. at 674.

The Texas Court of Criminal Appeals adopted the holding in *Oregon v. Kennedy* and held that generally, when a trial court grants a mistrial at a defendant's request, double jeopardy does not bar a retrial. *Ex parte Peterson*, 117 S.W.3d 804, 815 (Tex. Crim. App. 2003), *overruled in part on other grounds*

20

*Ex parte Lewis*, 219 S.W.3d 335, 371 (Tex. Crim. App. 2007). However, double jeopardy bars a retrial where the prosecutor's conduct was intentional in provoking the request for a mistrial. *Id.*

In determining whether the State intended to provoke the defense into moving for a mistrial, the Court should consider "the objective facts and circumstances of the prosecutor's conduct and the events which led to that conduct." *Ex parte Peterson*, 117 S.W.3d at 815; *Ex parte Lewis*, 219 S.W.3d at 371. The standard set forth in *Oregon v. Kennedy*, and adopted by *Ex parte Lewis*, is the standard to be applied in the present case and is the standard currently applied by the Texas Court of Criminal Appeals in analyzing double jeopardy cases in the mistrial context. *See Ex parte Pierson*, 426 S.W.3d 763, 768 n.5 (Tex. Crim. App. 2014); *Sandifer v. State*, 233 S.W.3d 1, 3 (Tex. App.—Houston [1st Dist.] 2007).

In its findings of fact and conclusions of law, the trial court detailed Duty's willful and intentional misconduct in withholding evidence in this case. Specifically, it is undisputed that Duty knew about the timestamps on the Walmart video because she watched them prior to trial on her own computer. Duty then willfully withheld that evidence because she "didn't feel very magnanimous." Knowing the State had a "very big advantage" in being able to play the Walmart

21

surveillance video, she consciously chose to withhold that information from the defense, despite repeated requests in writing for that evidence. Duty even admitted that she had a duty to turn over the evidence to the defense but did not.

The Court found that "the State's admitted decision to withhold the means to view timestamps on the Walmart surveillance video was intentional and provoked the Defense's request for a mistrial in this case." (CR: 889). The Court found further that "by Ms. Duty's own admission, her decision not to disclose to the Defense the means for playing timestamps on the Walmart surveillance video was intentional" and that "Ms. Duty was aware of, and watched, the Walmart surveillance video with timestamps prior to trial but did not disclose this fact to the Defense." (CR: 887). The Court then concluded, "Ms. Duty's conduct in this case, in which she withheld evidence, repeatedly violated Court orders, expressed bias against the Defendant and his Counsel, has been intentional and willful."[2] (CR: 887).

---

[2] It is important to note, as the trial court did, that Ms. Duty's conduct in this case includes repeated violations of a gag order which have since resulted in a finding of Contempt of Court. (CR: 884-86). In addition, Ms. Duty showed a video to the prosecutors in her office which was produced by her husband, that depicts images of lead defense counsel, Ryan Deck, and Appellant. (CR: 885). When the images are shown, one can hear a voice over of a woman, presumably Ms. Duty, saying "Fuck Ryan Deck" and "Fuck you too, [Appellant]." (CR: 885). Moreover, the video, filmed largely in the District Attorney's Office with Ms. Duty's permission, mocks sitting District Court Judges. (CR: 885).

Further, the trial court agreed that the standard set forth in *Oregon v. Kennedy* and *Ex parte Lewis* is the standard to applied in the present case and in analyzing double jeopardy claims in the mistrial context. (CR: 889). Despite these findings and conclusions, the trial court then, inexplicably concluded:

> It is unknown to the Court why Ms. Duty intentionally and willfully withheld the means to view timestamps on the Walmart Surveillance video other than from Ms. Duty's statement that '[defense counsel] acted so horribly to me during the first trial, that I just – I didn't even want to speak to them." (RR1: 202). The Court does not approve of this conduct or the reason for it. However, the Court finds no evidence that Ms. Duty intended to goad a mistrial or avoid an acquittal.

(CR: 889).

The Court's conclusion contradicts its own, voluminous findings of Duty's intentional and willful misconduct which provoked the request for a mistrial in this case. "[T]he objective facts and circumstances of the prosecutor's conduct and the events which led to that conduct" bear that out without question. *Ex parte Peterson*, 117 S.W.3d at 815; *Ex parte Lewis*, 219 S.W.3d at 371. The Court's finding even contradicts its own conclusion that "the State's admitted decision to withhold the means to view timestamps on the Walmart surveillance video was intentional and provoked the Defense's request for a mistrial in this case." (CR: 889).

23

It appears that although the Court acknowledged the standard set out in *Oregon v. Kennedy* and *Ex parte Lewis*, the Court actually mistakenly relied upon *Ex parte Masonheimer,* 220 S.W.3d 494 (Tex. Crim. App. 2007). There, the Court held that the standard enunciated in *Oregon v. Kennedy* barred retrial "under the unique circumstances of that case" because the State had intentionally failed to disclose exculpatory evidence with the specific intent to avoid the possibility of an acquittal. *See Sandifer v. State*, 233 S.W.3d 1, 3 (Tex. App.—Houston [1st Dist.] 2007), *citing Masonheimer*, 220 S.W.3d 494 (Tex. Crim. App. 2007). "The Masonheimer court reasoned that 'in a case like this, a defendant suffers the same harm as when the State intentionally "goads" or provokes the defendant into moving for a mistrial.'" *Id.* The holding in *Masonheimer* was specific to the facts of that case and did not add to the requirements set forth in *Oregon v. Kennedy* and *Ex parte Lewis*. *Id.*

The facts in *Masonheimer* showed that, in addition to intentionally provoking a request for a mistrial, the State intentionally withheld exculpatory evidence and purposefully sought to avoid an acquittal. *Ex parte Masonheimer,* 220 S.W.3d at 501. The fact that those additional circumstances occurred in *Masonheimer* does not change the standard set fort in *Oregon v. Kennedy* and adopted by *Ex parte Lewis*. As Justice Meyers explained in his dissent in

24

*Masonheimer*:

> My reading of *Oregon v. Kennedy* is that if the State's intentional actions goad the defendant into requesting a mistrial, then retrial is jeopardy-barred. Rather than considering whether the State actually wanted a mistrial, we look to see if the improper conduct of the State was intentional. In most cases, the circumstances leading a defendant to request a mistrial are accidental, such as a State's witness blurting out unelicited, inadmissible testimony. However, if we look at the State's actions and see that the prosecutors are intentionally doing things that they should anticipate would lead a judge to grant a mistrial if the defendant requested one, then it does not matter whether the State actually wanted a mistrial. The prosecutors may say that they did not want a mistrial, but if their actions were intentional rather than accidental or careless, and they should have known that a mistrial would be granted, then the *Oregon v. Kennedy* standard is met and retrial is jeopardy-barred. Rather than trying to determine the subjective intent of the prosecutor, we can objectively look at the actions of the State to determine if the actions were intentional.

*Ex parte Masonheimer,* 220 S.W.3d 494, 509-10 (Tex. Crim. App. 2007).

Quite simply, there is no added requirement that a defendant be required to elicit a confession from the State that it "goaded" the defense into requesting a mistrial or to show the prosecutor was trying to avoid an acquittal. *See Ex parte Lewis*, 219 S.W.3d at 371. The circumstances in *Masonheimer* were simply facts that occurred *in addition to* intentional conduct which provoked a request for a mistrial.

Appellant is only required to show the State acted intentionally in provoking the request for mistrial in this case. *See Ex parte Lewis*, 219 S.W.3d at 371.

25

This fact is largely undisputed by Duty's own admissions. According to the trial court's findings, the Appellant made the required showing by stating "The Court concludes that the State's admitted decision to withhold the means to view timestamps on the Walmart surveillance video was intentional and provoked the Defense's request for a mistrial in this case." (CR: 889). Because Appellant made the required showing to bar re-trial of this case, the trial court abused its discretion in denying habeas corpus relief. *See Sandifer v. State*, 233 S.W.3d at 3. Accordingly, Appellant's point of error should be sustained.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Appellant respectfully prays that this Court reverse the trial court's denial of habeas corpus relief in this case.

Respectfully submitted,

_____"/s/" Kristen Jernigan_____
KRISTEN JERNIGAN
State Bar Number 90001898
207 S. Austin Ave.
Georgetown, Texas 78626
(512) 904-0123
(512) 931-3650 (fax)
Kristen@txcrimapp.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing Appellant's Brief has been emailed to the Williamson County District Attorney's Office to the following addresses: jduty@wilco.org, mbrunner@wilco.org and bwebster@wilco.org on October 13, 2015.

_____"/s/" Kristen Jernigan_____
Kristen Jernigan

## CERTIFICATE OF WORD COUNT

The undersigned hereby certifies that the foregoing document consists of 7,185 words in compliance with Texas Rule of Appellate Procedure 9.4.

_____"/s/" Kristen Jernigan_____
Kristen Jernigan

27